## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Calvin Smith,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>National Grid USA,<br><br>                              Defendant. | 2:21-cv-6899<br>(NJC) (LGD) |

## OPINION AND ORDER

NUSRAT J. CHOUDHURY, United States District Judge:

Calvin Smith ("Smith") brings this case against his former employer National Grid USA Service Company ("National Grid"),[1] alleging claims for discrimination on the basis of race, hostile work environment, and retaliation under the following federal, state, and local statutes: 42 U.S.C. § 1981 ("Section 1981"); Title VII, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"); New York State Human Rights Law, N.Y. Exec. L. § 296(1)(a) ("NYSHRL"); and New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107(1)(a), 8-107(7) ("NYCHRL"). (Am. Compl., ECF No. 18.)

Before me is National Grid's Motion for Summary Judgment ("Motion"), in which National Grid seeks to dismiss all claims against it. (Mot., ECF No. 46.) As set forth below, I grant National Grid's Motion in part and deny it in part.

---

[1] The Amended Complaint names "National Grid USA" as the sole defendant, but National Grid clarifies in its Motion for Summary Judgment that its correct name is "National Grid USA Service Company." (ECF No. 47 at 1.)

First, National Grid fails to show it is entitled to summary judgment on Smith's hostile work environment claims. The "continuing violation" doctrine applies to Smith's hostile work environment claims under Section 1981 and Title VII, and thus no portion of those claims is time-barred. Further, as the Court made clear during the pre-motion conference concerning National Grid's anticipated Motion, there are numerous triable issues of fact precluding summary judgment on Smith's hostile work environment claims under all of the relevant statutes: Section 1981, Title VII, the NYSHRL, and the NYCHRL. (*See* Minute Entry, Feb. 12, 2024.)

Second, a portion of Smith's discrimination claims survives summary judgment. Smith's discrimination claims under Section 1981 are time-barred with respect to incidents occurring before December 15, 2017. His discrimination claims under Title VII are time-barred with respect to incidents occurring before June 27, 2020. Concerning Smith's discrimination claims under all relevant statutes—Section 1981, Title VII, the NYSHRL, and the NYCHRL—there are triable issues of fact over whether Smith experienced a qualifying adverse employment action. However, to the extent Smith's discrimination claims are founded on the theory that his supervisor, Kerry Martin, treated Smith worse than he treated a co-worker named Shapiro, no reasonable jury could find in favor of Smith on this theory because there is no dispute that Martin joined National Grid after Shapiro retired. Likewise, to the extent Smith's discrimination claims are founded on a "failure to promote" theory, no reasonable jury could find in favor of Smith on this theory since there is no record evidence that Smith was qualified for the relevant positions or that National Grid continued to seek similarly qualified applicants after rejecting Smith. Finally, with respect to Smith's Section 1981 discrimination claim specifically, there are

triable issues of fact over whether racial discrimination was the "but-for" cause of the alleged adverse employment actions.

Third, National Grid fails to show it is entitled to summary judgment on Smith's retaliation claims founded on the alleged failure to promote Smith in late 2021 and early 2022, after he filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on April 23, 2021 ("EEOC Charge"). This specific retaliation claim is not time-barred under Section 1981 or Title VII, and Smith sufficiently exhausted his administrative remedies as required to pursue the claim under Title VII. Thus, Smith's claims under Section 1981, Title VII, the NYSHRL, and the NYCHRL for retaliation under the "failure to promote" theory survive summary judgment. However, with respect to all theories of retaliation other than the alleged failure to promote Smith in late 2021 and early 2022 in retaliation for Smith filing the EEOC Charge, I grant summary judgment to National Grid because no reasonable jury could find a causal connection between the remaining alleged protected activities and the alleged retaliatory actions.

## JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Smith brings claims under two federal statutes, Section 1981 and Title VII. The Court has supplemental jurisdiction over the state law claims alleged in the Amended Complaint under 28 U.S.C. § 1367(a) because those claims are part of the same case or controversy as the federal claims.

Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b)(2) because the Amended Complaint alleges that a substantial part of the events that gave rise to Smith's claims occurred in this district. (*See generally* Am. Compl. ¶¶ 11–52.)

## BACKGROUND

Smith, a Black and Hispanic man, is a former employee of National Grid, having worked at the company from October 2012 until his resignation in late 2021 or early 2022.[2] (Smith Tr. II 13:22–24, 66:8–11, 327:4–25.)[3] The record contains evidence of numerous incidents occurring from roughly 2014 to late 2021 or early 2022, which Smith contends raise triable issues of fact as to his discrimination, hostile work environment, and retaliation claims. The following is a brief overview of the key facts, which are not in dispute unless otherwise noted.[4]

In May 2014, Smith interviewed for, and subsequently was reassigned to, the position of Parts Person in National Grid's Fleet Department in Greenpoint, Brooklyn. (National Grid Rule 56.1 Statement ¶ 16.)[5] Upon Smith starting this new position, Kerry Martin ("Martin"), who had

---

[2] The record is not clear as to when exactly Smith left his job at National Grid. Smith's Rule 56.1 Counterstatement states that he resigned in October 2021, but the cited evidence does not specify a resignation date. (ECF No. 40 ¶ 39.) By contrast, in Smith's supplemental affidavit, he declares under penalty of perjury that he resigned in April 2022. (ECF No. 49-1 ¶ 26.)

[3] The parties submitted three different excerpts from Smith's deposition transcript, but did not submit the full transcript. (Smith Tr. I, ECF No. 35-1; Smith Tr. II, ECF No. 41-1; Smith Tr. III, ECF No. 53-1.)

[4] Pursuant to Rule 56.1 of the Local Civil Rules for the Southern and Eastern Districts of New York, National Grid submitted along with its Motion a "statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." (National Grid Rule 56.1 Statement, ECF No. 34; Local Rule 56.1(a).) Smith submitted a response "admitting or denying, and otherwise responding to" National Grid's statement, as well as a "statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." (Smith Rule 56.1 Resps., ECF No. 40 at 1–33; Smith Rule 56.1 Counterstatement, ECF No. 40 at 33–38; Local Rule 56.1(b)().) National Grid did not respond to the disputed material facts set forth in Smith's Rule 56.1 Counterstatement.

[5] The record evidence that National Grid cites (Smith's deposition transcript at pages 44 and 45) does not state the month in which Smith was transferred to the role of Parts Person, and I have not found this fact elsewhere in the limited excerpts of Smith's deposition transcript that the parties provided. Nevertheless, the parties do not dispute that Smith's transfer occurred in May 2014, so I deem this fact admitted. (*See* Smith Rule 56.1 Resps. ¶ 16.)

been hired by National Grid on April 28, 2014, became Smith's supervisor. (Smith Tr. II 44:19–45:3; Martin Tr. I 13:12–15, 15:7–21.)[6] The record contains evidence that, despite the Greenpoint location being "one of the largest locations in the downstate New York region," there were relatively few Black employees working at that location. (Martin Tr. I 54:4–9; *see also id.* 53:13–17 (Martin testifying that, in 2018, Martin was the only Black employee in a supervisory position); *id.* 164:22–165:3 (Martin testifying that, in July 2020, he, Smith, Jules Desrosiers, and Greg Coleman were the only Black fleet members in Greenpoint); *id.* 164:12–14 (Martin testifying that all technicians supervised by Peter Polumbo were white).) For at least some portion of his tenure at National Grid, Smith was the only Black person supervised by Martin. (*Id.* 47:14–17.)

According to Smith, Martin treated Smith worse than he had treated Stuart Shapiro ("Shapiro"), the white employee whom Smith replaced after Shapiro's retirement, although this characterization is disputed by National Grid and Martin's deposition testimony. (*See* Martin Tr. I 48:14–25, 86:15–22.) Smith testified that Martin "badgered" Smith with a "barrage" of emails, sent "back-to-back, every other minute," and made repeated nagging phone calls, demanding immediate answers. (Smith Tr. II 100:23–101:14.) Smith testified that Martin's tone was "completely different" towards him than it was to his "other counterparts, the ones that didn't identify as black." (Smith Tr. II 116:16–19.) He also testified that he met with Martin "sometime in the summer of 2014" to discuss what he perceived as harsh treatment and the fact that his work hours had been changed against his wishes. (Smith Tr. II 50:2–52:2.) According to Smith,

---

[6] The parties submitted two different excerpts of Martin's deposition transcript, but did not submit the full transcript. (Martin Tr. I, ECF No. 35-3; Martin Tr. II, ECF No. 41-3.)

Martin (who is also Black) told him, "People like us don't get to make these decisions," and gestured at his skin. (Smith Tr. II 52:3–21.)

National Grid disputes Smith's characterization of Martin's behavior towards Smith. In particular, business records show that Martin never supervised (or even worked with) Shapiro because Shapiro retired in January 2014 and Martin was not hired at National Grid until April 2014. (Martin Tr. I 13:12–15 (Martin testifying that his first day was April 28, 2014); ECF No. 52-2 (company records showing Shapiro's last day as January 29, 2014).) Also, at his deposition, Martin testified that he told Smith that everyone at National Grid was treated the same, regardless of race. (Martin Tr. II 49:2–4, 51:18–25.)

Several years later, at some point in 2017, Smith worked as an Auto Mechanic at a National Grid location in Canarsie, Brooklyn, where he was managed by Victor Arujo ("Arujo"). (Smith Tr. II 15:3–18.) In March 2018, while working in Canarsie, Smith wrote a letter informing National Grid's Ethics Department that he was not being offered certain training opportunities, despite the fact that junior white colleagues were getting those opportunities. (D00022 at D00029, ECF No. 41-7; Demchak Tr. I 102:19–103:1[7].)

Records from National Grid's Ethics Department show that, on July 2, 2018, Jules Desrosiers, another Black employee, reported that he was being "persistently targeted by [Martin]." (D00022 at D00028.) For example, Martin "scream[ed]" at him and "threaten[ed]" to fire him for not completing a task that was never assigned to him in the first place. (*Id.* at D00029.)

---

[7] The parties submitted two different excerpts of Demchak's deposition transcript. (Demchak Tr. I, ECF No. 35-2; Demchak Tr. II, ECF No. 41-2.)

In October 2018, Smith was promoted to serve as a Lead Technician in Greenpoint and returned to that National Grid location. (Smith Tr. I 37:19–23, 181:2–7.)

According to Smith, in February 2020, Martin accused Smith of stealing a chair from his office, despite the fact that the chair was company property and did not belong to Martin. (Smith Tr. II 320:3–11.) Smith testified that, in any event, he did not take the chair from Martin's office. (*Id.* 318:21–319:3.) Martin testified that he purchased the chair, although his testimony is not clear as to whether he meant that he purchased the chair for himself, or on behalf of National Grid. (Martin Tr. I 144:7–145:20.) Martin maintains that he did not accuse Smith of "stealing" the chair, but rather had a "conversation" with Smith about taking the chair from his office without permission. (*Id.*)

According to Smith, in early May 2020, Martin accused Smith of falsifying business records for closing a repair ticket at night and opening a "deviation ticket" the following day.[8] (*See* P00010 at P00010–11, ECF No. 41-5.) On May 8, 2020, Smith complained to National Grid's Labor Relations team that numerous employees engaged in the same practice at the direction of their supervisors, but that Martin singled out Smith. (P00007 at P00007–08, ECF No. 41-4.)[9]

Also around June 2020, Smith witnessed Patrick Clark ("Clark") (a white employee) call Tarik Boyd ("Boyd") (a Black employee) a "monkey." (Smith Tr. 269:15–271:18.) In a June 22, 2020 letter, Smith reported the incident to Martin and Jason Parks ("Parks"), another supervisor.

---

[8] In their briefing, neither party explains the significance of opening two tickets or why this practice might constitute falsification of business records.

[9] The cited document does not specifically state that the other employees who were not reprimanded were not Black, although, as Martin testified, around this time, there were only three Black employees in non-supervisory roles in the Greenpoint fleet. (Martin Tr. I 164:22–165:3.)

(P00010 at P000010–11.) Labor Relations Department employee Diane Demchak ("Demchak") investigated and eventually suspended Clark without pay for 10 days. (Demchak Tr. I 63:5–64:4.)

In July 2020, Smith discovered that a white employee, Peter Polumbo ("Polumbo"), had written the term "SHINE BOX" in black marker on Smith's lock box. (Smith Tr. I 235:15–25; Smith Tr. II 214:15–217:10; D000551, ECF No. 35-8.) The parties dispute the meaning behind the graffiti. Smith believes that Polumbo used "SHINE BOX" as a derogatory term "refer[ring] to black shoe shiners." (Smith Tr. II 215:15–19, 217:5–10.) National Grid, citing Polumbo's deposition testimony, maintains that the term was not racially charged but was intended to be a humorous reference to a quote from the movie *Goodfellas*. (Polumbo Tr. 59:5–62:6, ECF No. 35-7.) Following its investigation, National Grid generally agreed with Polumbo's version of the story. (Demchak Tr. I 40:19–42:19; Demchak Tr. II 69:19–71:5.)

"At one point," Lou Vetrano ("Vetrano") took over supervising Smith, which Smith testified was "due to [Smith's] complaints with [] Martin." (Smith Tr. II 126:2–8.) Smith described Vetrano's treatment of him as similar to Martin's, noting that Vetrano's behavior "[did not] allow [Smith] to do [his] job" because the constant harassment "ma[de] it extremely difficult to get things done." (Smith Tr. II 129:24–130:2.)

In October 2020, Smith complained to Demchak that Greg Coleman ("Coleman") (another Black employee) was denied the opportunity to obtain a company-sponsored commercial driver's license, despite the fact that a white employee in the same position was offered this opportunity. (Smith Tr. II 278:11–284:8.) Also in October 2020,[10] Smith complained

---

[10] The cited portion of Martin's testimony does not specify when this incident occurred, but the parties do not dispute that it occurred in October 2020. (Smith Rule 56.1 Resps. ¶ 131.)

to Martin that he had ignored an OSHA violation by a white employee while effectively singling Smith out for committing the same OSHA violation. (Martin Tr. I 107:8–109:8.) Martin testified at his deposition that he had told Smith he was stacking too many boxes on the highest level of shelving, in violation of the "OSHA guideline stating that there needs to be a ledge on the very top shelf where you can't stack boxes so high." (*Id.*) Later, Smith informed Martin that Richard Simpson ("Simpson") had been stacking "boxes at the highest ledge" for months and that "no one said anything to him." (*Id.*) Martin testified that he was not aware of the other employee's OSHA violation until Smith brought it to his attention, and that, upon Smith informing Martin of the issue, he instructed Simpson to remove the over-stacked boxes. (*Id.*)

On April 23, 2021, Smith filed an EEOC Charge against National Grid. (EEOC Charge, P000186-193, ECF No. 35-12.)

On July 21, 2021, Smith sent an email to Demchak, on National Grid's Labor Relations team, requesting to view the performance reviews of all 101 employees in his department "for fair and unbiased treatment," based on his view that his own performance review was "incomplete and inaccurate." (D000738 at D000739, ECF No. 41-16.) Demchak forwarded Smith's email to National Grid Human Resources employee Michael Bernardo ("Bernardo"). (*Id.*) In the email, she expressed concern that Smith was challenging the qualifications of his coworkers whom he represented as a union delegate and wrote, "That sound you hear are my eyes rolling!" (*Id.* at D000738.) Smith followed up with Demchak via email on August 4, 2021, regarding his request for a meeting to discuss his perception that white employees received preferential treatment. (D000826, ECF No. 41-15.) Demchak forwarded Smith's email to Bernardo, writing, "There is not enough Dr[.] Pepper in the world." (*Id.*)

Smith claims that, in Fall 2021, he applied for a "supervisor development position" at National Grid but was denied the position without being interviewed. (Smith Aff. ¶ 21, ECF No. 49-1.)[11] He also claims that, around January 2022, he applied and interviewed for a "warehouse supervisor position." (*Id.* ¶ 22.)[12] He believes that the interview went well but, nevertheless, he was denied the position. (*Id.* ¶ 23.) At his deposition, Smith testified that he does not "[o]fficially" know why he did not get the promotion for which he interviewed. (Smith Tr. II 321:23–25.) In his supplemental affidavit, however, Smith attests under penalty of perjury that another National Grid supervisor, Charlie Keinath ("Keinath"), told him that he was denied the warehouse supervisor position because he was "not to be touched." (Smith Aff. ¶ 24.) Smith testified in his deposition that he recalled hearing this but was not positive that it was Keinath who said it. (Smith Tr. 321–22.) Smith also attests under penalty of perjury in the supplemental affidavit that he generally understood that "National Grid would not promote [him] into a supervisor position, despite [his] nearly a decade long tenure with the company." (Smith Aff. ¶¶ 22–25.)[13]

In late 2021 or early 2022, Smith resigned from National Grid. (Smith Rule 56.1 Counterstatement ¶ 39 (stating that Smith resigned in October 2021); Smith Aff. ¶ 25 (Smith attesting that he resigned in April 2022).) In his deposition, he testified:

---

[11] The parties do not provide any evidence of the qualifications for, or duties or responsibilities of, this position.

[12] The parties similarly do not provide any evidence of the qualifications for or duties or responsibilities of this position.

[13] Neither party has submitted as an exhibit the portion of Smith's deposition transcript in which he discusses his recollection about this remark made by a National Grid employee, but National Grid provides what it claims to be the relevant deposition transcript excerpt on page three of its reply brief.

> I didn't want to leave National Grid . . . The environment was not conducive to me . . . But between the opportunities not being available to me and the environment that I was working in, under the direction of my therapist, it was having a negative impact on my mental state, so under her suggestion, I decided to leave National Grid.

(Smith Tr. II 327:4–25.)

## PROCEDURAL HISTORY

On December 14, 2021, Smith filed the Complaint in this action. (Compl., ECF No. 1.) Smith filed the Amended Complaint—the operative complaint in this action—on February 10, 2023. (Am. Compl.)

On November 30, 2023, National Grid filed a letter motion seeking a pre-motion conference in support of its anticipated motion for summary judgment, along with a statement of undisputed material facts pursuant to Rule 56.1 of the Local Civil Rules of this District and supporting evidentiary submissions. (National Grid Ltr. Mot., ECF No. 33; National Grid Rule 56.1 Statement.) On January 4, 2024, Smith filed an opposition letter, a Rule 56.1 counterstatement, and additional supporting evidentiary submissions. (Smith Opp'n Ltr., ECF No. 39; Smith Rule 56.1 Resps.; Smith Rule 56.1 Counterstatement.)

On February 9, 2024, I held a pre-motion conference, during which I stated my view that the record presented "numerous material questions of fact that preclude a grant of summary judgment to [National Grid] on [Smith's] hostile work environment claim." (Elec. Order, Feb. 12, 2024.) Nevertheless, I permitted the parties to submit lengthy supplemental letters regarding National Grid's Motion as to Smith's hostile work environment claim. (*Id.*) I also permitted the parties to provide full briefing on National Grid's Motion with respect to Smith's discrimination and retaliation claims. (*Id.*) The parties filed their supplemental letters on February 23, 2024. (Smith Suppl. Ltr., ECF No. 43; National Grid Suppl. Ltr., ECF No. 44.) On May 3, 2024, the

parties filed their full briefing on National Grid's Motion, along with additional evidentiary submissions. (National Grid Mem., ECF No. 47; Smith Opp'n, ECF No. 48; National Grid Reply, ECF No. 50.)

On February 12, 2025, Smith filed a Notice of Supplemental Authority, attaching the Second Circuit's recent decision in *Back v. Bank Hapoalim, B.M.*, No. 24-1064-CV, 2024 WL 4746263 (2d Cir. Nov. 12, 2024), as well as two recent Southern District of New York decisions—*Rackley v. Constellis, LLC*, No. 22-cv-4066, 2024 WL 3498718 (S.D.N.Y. June 17, 2024), and *Anderson v. Amazon.com, Inc.*, No. 23-cv-8347, 2024 WL 2801986 (S.D.N.Y. May 31, 2024). (Smith Not. Suppl. Auth., ECF No. 55.) On March 14, 2025, National Grid filed a response letter. (National Grid Not. Suppl. Auth. Resp., ECF No. 56.)

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a material question of fact. *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022).[14] "A fact is material if it might affect the outcome of the suit under the governing law." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of "material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In order to defeat summary judgment, the non-moving party must set forth sufficient facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c). The non-moving party

---

[14] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

"may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Banes*, 593 F.3d 159, 166 (2d Cir. 2010); *see also Daly v. Westchester Cnty. Bd. of Legislators*, No. 23-1220-CV, 2024 WL 3264125, at *2 (2d Cir. July 2, 2024). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks*, 593 F.3d at 166. A court considering whether summary judgment is appropriate "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Cunningham*, 86 F.4th at 980; *see also Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 939 (2d Cir. 2024) ("We may find for the movant defendant only if we conclude that on the record presented, considered in the light most favorable to the non-movant plaintiff, no reasonable jury could find in the plaintiff's favor."). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

## DISCUSSION

For the reasons explained below, I grant in part and deny in part National Grid's Motion, as follows:

**Hostile Work Environment Claims.** The "continuing violation" doctrine applies to Smith's hostile work environment claims under Section 1981 and Title VII, and thus no portion of those claims is time-barred. Further, there are numerous triable issues of fact precluding summary judgment on Smith's claims under all of the relevant statutes (Section 1981, Title VII, the NYSHRL, and the NYCHRL).

**Discrimination Claims.** Smith's discrimination claims under Section 1981 are time-barred with respect to incidents occurring before December 15, 2017; his discrimination claims under Title VII are time-barred with respect to incidents occurring before June 27, 2020. Concerning Smith's discrimination claims under all relevant statutes (Section 1981, Title VII, the NYSHRL, and the NYCHRL), there are triable issues of fact over whether Smith experienced a qualifying adverse employment action. However, to the extent Smith's discrimination claims are founded on the theory that Martin treated Smith worse than he treated Shapiro, no reasonable jury could find in favor of Smith on this theory because there is no dispute that Martin joined National Grid after Shapiro retired. Likewise, to the extent Smith's discrimination claims are founded on a "failure to promote" theory, no reasonable jury could find in favor of Smith on this theory since there is no record evidence that Smith was qualified for the relevant positions or that National Grid continued to seek similarly qualified applicants after rejecting Smith. Finally, with respect to Smith's Section 1981 discrimination claim specifically, there are triable issues of fact over whether racial discrimination was the "but-for" cause of the alleged adverse employment actions.

**Retaliation Claims.** Smith's retaliation claims under Section 1981 are time-barred with respect to incidents occurring before December 15, 2017; his retaliation claims under Title VII are time-barred with respect to incidents occurring before June 27, 2020. Concerning Smith's Title VII retaliation claim specifically, Smith has sufficiently exhausted his administrative remedies. With respect to Smith's retaliation claims under all statutes invoked (Section 1981, Title VII, the NYSHRL, and the NYCHRL), there are triable issues of fact that preclude summary judgment to National Grid, to the extent these claims are founded on Smith's failure to receive promotions in late 2021 and early 2022 after he filed the EEOC Charge on April 23,

2021. With respect to all other theories of retaliation, I grant summary judgment to National Grid because no reasonable jury could find a causal connection between the remaining alleged protected activities and the alleged retaliatory actions.

## I. Hostile Work Environment Claims

In its supplemental letter, National Grid raises four main arguments supporting summary judgment as to Smith's hostile work environment claims. First, National Grid asserts that Smith's Section 1981 hostile work environment claim is time-barred with respect to incidents occurring before December 15, 2017 and his Title VII hostile work environment claim is time-barred with respect to incidents occurring before June 27, 2020. (National Grid Suppl. Ltr. at 2.) According to National Grid, the "continuing violation" doctrine does not apply because the incidents allegedly giving rise to a hostile work environment were not "substantially related" to each other. (*Id.* at 2–7 (citing *Bonterre v. City of New York*, No. 18-cv-745, 2021 WL 4060358, at *3 (S.D.N.Y. Sept. 7, 2021)).) Second, National Grid argues that, as a matter of law, the incidents contributing to the alleged hostile work environment do not meet the "severe or pervasive" standard under Title VII or Section 1981. (*Id.* at 9–10.) Third, National Grid argues that there is a "paucity of evidence of racial animus or hostility" in the alleged interactions. (*Id.* at 9.) Fourth, with respect to the "SHINE BOX" graffiti incident specifically, National Grid argues (1) that the phrase was a reference to the popular film *Goodfellas* and thus the graffiti did not have a racially hostile connotation and (2) that, even if the phrase did have a racially hostile connotation, National Grid cannot be held liable because the graffiti was authored by Polumbo, a non-supervisory employee. (*Id.* at 10–13.) National Grid fails to address why there is no triable issue of fact concerning Smith's NYSHRL and NYCHRL hostile work environment claims, which do not apply the same "severe or pervasive" standard as the federal claims. (*See generally* National Grid Mem.)

15

In his supplemental letter, Smith points to three issues that he believes raise genuine disputes of material fact regarding his hostile work environment claim. First, Smith argues that, when assessed in light of "the social context in which [the incident] occurred," the "SHINE BOX" graffiti incident "contributed to a racially hostile work environment." (Smith Suppl. Ltr. at 1–3 (citing *McLeod v. Jewish Guild for the Blind*, 693 F. App'x 65, 67 (2d Cir. 2017)).) Second, Smith contends that his supervisors' actions—namely, his supervisors' decision to give him "a disproportionately high workload," subject him to "false accusations of misconduct," and engage in "physically threatening behavior"—demonstrate a "pervasive pattern of discriminatory conduct" under Title VII and Section 1981. (*Id.* at 3–4, 5–6.) Third, Smith argues that Polumbo's alleged "acts of sabotage" against Smith contributed to a hostile work environment. (Smith Suppl. Ltr. at 5.)

The parties submitted their supplemental letters regarding Smith's hostile work environment claims simultaneously, meaning that the parties did not directly respond to the specific points made in their respective letters. Accordingly, Smith's supplemental letter does not expressly address National Grid's argument that it cannot be held liable for alleged hostile actions taken by non-supervisory employees. However, Smith argues that the Court should take into account the treatment of other Black employees, namely Desrosiers; thus, Smith contends, there is a triable issue of fact as to whether Smith "was aware of" the alleged incidents involving Desrosiers and whether "in light of these incidents, the incidents [Smith] experienced more directly would reasonably be perceived, and were perceived, as hostile or abusive." (Smith Suppl. Ltr. at 5.) Smith's supplemental letter likewise does not address National Grid's argument that the "continuing violation" doctrine applies because the alleged incidents are not "substantially related." However, in his opposition brief, Smith broadly argues that his "claims

are not time barred under the continuing violation theory as [National Grid] engaged in a discriminatory policy or practice." (Smith Opp'n at 7.)

As explained below, I find the following:

(1) the "continuing violation" doctrine applies and thus there is no time bar on Smith's hostile work environment claims under Section 1981 and Title VII;

(2) there are numerous genuine disputes of material fact precluding summary judgment on Smith's hostile work environment claims under all relevant statutes—Section 1981, Title VII, the NYSHRL, and the NYCHRL.

### A.  Statute of Limitations and the "Continuing Violation" Doctrine

The statute of limitations for Section 1981 claims is four years from the alleged unlawful employment practice. 28 U.S.C. § 1658(a); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–83 (2004) (applying 28 U.S.C. § 1658(a) to Section 1981 claims). Since Smith filed the initial Complaint in this action on December 14, 2021, National Grid argues that the statute of limitations bars Smith's Section 1981 claims with respect to any alleged incidents that occurred prior to December 15, 2017. (National Grid Mem. at 8; National Grid Suppl. Ltr. at 2.)

Title VII requires the plaintiff to file a charge with the EEOC within either 180 or 300 days of the alleged unlawful employment practice, with the longer timeframe applying when a plaintiff has first instituted proceedings with a state or local agency with authority to grant or seek relief.[15] 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). The EEOC charge timing requirement "operates as a statute of limitations." *Banks v. General Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023). National Grid concedes that the 300-day

---

[15] Title VII provides two statutory deadlines for filing an EEOC charge. 42 U.S.C. § 2000e-5(e)(1). In general, the plaintiff must file the EEOC charge within 180 days of the alleged unlawful employment practice. *Id.* However, where the plaintiff "has initially instituted proceedings with a State or local agency with authority to grant or seek relief from [the unauthorized employment] practice," the plaintiff must file the EEOC charge within 300 days of the alleged unlawful employment practice. *Id.*

time limit applies to Smith's claims.[16] National Grid argues that because Smith filed the EEOC

Charge on April 23, 2021, the EEOC timing requirement bars Smith's Title VII claims with

respect to any alleged incidents that occurred before June 27, 2020 (i.e., any alleged incidents

that occurred more than 300 days prior to Smith filing the EEOC Charge). (National Grid Mem.

at 8; National Grid Suppl. Ltr. at 2.)

　　In determining whether alleged incidents contributing to a hostile work environment that

occurred outside the statute of limitations are actionable, "[i]t does not matter . . . that some of

the component acts of the hostile work environment fall outside the statutory time period"; so

long as "an act contributing to the claim occurs within the filing period, the entire time period of

the hostile environment may be considered by a court for the purposes of determining liability."

*Banks*, 81 F.4th at 260; *see also Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir.

2019) ("A charge alleging a hostile work environment claim . . . will not be time barred so long

as all acts which constitute the claim are part of the same unlawful employment practice *and at

least one act falls within the time period*." (quoting *Morgan*, 536 U.S. at 122)).

Still, despite this relatively lenient standard, "the timely incident must be sufficiently

related to the prior events so that they can be said to be part of the 'same' hostile work

environment." *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F. App'x 88, 92 (2d Cir. 2014)

(summary order) (citing *Morgan*, 526 U.S. at 118); *see also Dziedzic v. State Univ. of New York*

---

[16] The record does not show that Smith "initially instituted proceedings with a State or local
agency" such that Title VII's 300-day (and not the 180-day) time restriction would apply.
Nevertheless, National Grid does not dispute that the 300-day restriction applies to Smith's Title
VII claims and, accordingly, that is the restriction I apply here. *See Hardaway v. Hartford Public
Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018) ("[F]iling of a timely charge of discrimination
with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that,
like a statute of limitations, is subject to waiver . . .") (quoting *Zipes v. Trans World Airlines,
Inc.*, 455 U.S. 385, 393 (1982)).

*at Oswego*, 648 F. App'x 125, 127–28 (2d Cir. 2016) (summary order) ("continuing violation" doctrine did not apply where untimely sexual joke "was made by different co-workers in a different section of the paint department than the [timely] harassment" alleged); *Staten v. City of New York*, 653 F. App'x 78, 80 (2d Cir. 2016) (summary order) ("continuing violation" doctrine did not apply where the timely claims "focused primarily on complaints about specific job assignments, orders that [the plaintiff] disagreed with, or issues with the department confirming that [the plaintiff] complied with internal rules," while the untimely claims "alleged derogatory comments, unjust punishment for failing to secure his locker, and withholding of PBA cards"); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77–78 (2d Cir. 2010) ("continuing violation" doctrine did not apply where timely claims concerned an inappropriate comment about a sleepover and untimely claims concerned "lewd" comments made by individuals in a different department and "sector of the building"); *but see Sooroojballie v. Port Auth. of N.Y. and N.J.*, 816 F. App'x 536, 541–42 (2d Cir. 2020) (summary order) ("continuing violation" doctrine applied where "non-discrete acts" of "lack of training, evaluations, and discipline" occurred both inside and outside of the statutory period); *James v. Van Blarcum*, 782 F. App'x 83, 84–85 (2d Cir. 2019) ("continuing violation" doctrine applied where similar racial comments were made both inside and outside of the statutory period). Further, while the Second Circuit has not yet endorsed a specific test for determining whether alleged timely and untimely harassing acts are "sufficiently related," district courts have considered factors including "(1) whether the timely and untimely harassment is of a similar nature, (2) whether the same individuals perpetuated the harassment, (3) the frequency and temporal proximity of the acts, and (4) whether the employer took any intervening remedial action." *Bonterre v. City of New York*, No. 18-cv-745, 2021 WL 4060358, at *3 (S.D.N.Y. Sept. 7, 2021).

Under Section 1981's statute of limitations, incidents occurring before December 15, 2017 are untimely and incidents occurring on or after that date are timely. Under Title VII's time restriction, incidents occurring before June 27, 2020 are untimely and incidents occurring on or after that date are timely. Nevertheless, applying the standard articulated above, I find that at least some of the otherwise untimely incidents contributing to the alleged hostile work environment are "sufficiently related" to the timely incidents to qualify as continuing violations. This specifically includes (1) incidents concerning Martin's alleged mistreatment of Smith and (2) racially hostile altercations involving coworkers.

Concerning claims of hostile treatment by Martin, there is record evidence raising issues of fact as to whether Martin overloaded Smith with work (Smith Tr. II 100:23–101:14 (beginning in 2014)), badgered Smith with emails (*id.* (beginning in 2014)), made a comment to Smith suggesting that he was treating Smith differently because of his race (Smith Tr. II 52:7–21 (occurring in 2014)), falsely accused Smith of stealing a chair (Smith Tr. II 320:3–11 (occurring in February 2020)), falsely accused Smith of falsifying business records based on conduct for which white employees did not get in trouble (P00010 at P00010–11; P00007 at P00007–08 (occurring in May 2020)), and singled Smith out for an OSHA violation despite ignoring an OSHA violation by a white employee (Smith Tr. II 278:11–284:8 (occurring in October 2020)). The timely incidents under Section 1981—Martin's false accusation that Smith stole a chair, Martin's false accusation that Smith falsified business records, and Martin's act of singling Smith out for an OSHA violation—are "sufficiently related" to the otherwise untimely incidents, particularly because Martin is involved in all of these alleged actions. *See Bonterre*, 2021 WL 4060358, at *3 (considering, among other things, "whether the timely and untimely harassment is of a *similar nature*," "whether the *same individuals* perpetuated the harassment," and "the

20

*frequency . . . of the acts*" (emphasis added)). Although Title VII's limitations period is shorter, the same analysis applies since the OSHA incident occurred within the limitations period. *See Davis-Garett*, 921 F.3d at 42 (hostile work environment claim is timely if "at least one act falls within the time period").

Concerning racially hostile incidents involving coworkers, under Section 1981, both the incident in which a white coworker called a Black coworker a "monkey" (Smith Tr. 269:15–271:18 (occurring in June 2020)) and the "SHINE BOX" graffiti incident (Smith Tr. I 235:15–25; Smith Tr. II 214:15–217:10 (occurring in July 2020)) are timely. Under Title VII, the incident in which a white coworker called a Black coworker a "monkey" may be untimely, since Title VII's cutoff is June 27, 2020 and the record before me does not indicate when in June 2020 this incident occurred. Regardless, these incidents are likewise sufficiently related that the "continuing violation" doctrine applies. *See James*, 782 F. App'x at 84–85 ("continuing violation" doctrine applied where similar racial comments were made both inside and outside of the statutory period).

### B.  Issues of Fact

A hostile work environment claim under Title VII and Section 1981 requires a plaintiff to show that his workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020); *see also Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998) (holding that Title VII is not "a general civility code" but rather "forbids only behavior so objectively offensive as to alter the conditions of the victim's employment"); *Banks*, 81 F.4th at 261–62 (holding that hostile work environment claims under Title VII and Section 1981 are assessed applying the same standard). This inquiry "involves both objective and subjective elements." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir.

21

2009). To prevail on a hostile work environment claim, the plaintiff must show (1) that the alleged conduct was "severe or pervasive enough to create an *objectively* hostile or abusive work environment" and (2) that the plaintiff "*subjectively* perceive[d] that environment to be abusive." *Id.* (emphasis added). In the objective inquiry, courts assess the totality of circumstances, weighing various factors, including: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). The plaintiff must prove that he faced "harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse"; in this inquiry, however, the Second Circuit has cautioned against "setting the bar too high." *Id.*

The plaintiff must also prove that his membership in a protected class caused him to experience a hostile work environment. *Id.* at 112; *see also* 42 U.S.C. § 2000e-2(a)(1) (prohibiting adverse employment actions "*because of* such [employee's] race, color, religion, sex, or national origin" (emphasis added)). In other words, courts apply a "but-for" causation test to determine whether the plaintiff would have experienced the same hostile work environment had he not been a member of the protected class at issue (here, Smith's protected class is race). *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020).

"For a[n] NYCHRL [hostile work environment] claim to survive summary judgment, the plaintiff need only show that [his] employer treated [him] less well than other employees, at least in part for a discriminatory reason." *Williams v. New York City Housing Auth.*, 61 F.4th 55, 69 (2d Cir. 2023). "Nevertheless, the NYCHRL is not a general civility code, and even if the plaintiff establishes that [he] was treated less well because of [his race], [the] defendant[] may

assert an affirmative defense whereby [it] can still avoid liability if . . . the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Id.*

On October 11, 2019, the New York legislature amended N.Y. Exec. Law § 296 to remove the "severe or pervasive" requirement for discrimination claims brought under the NYSHRL. *See* N.Y. Exec. Law § 296(1)(h) (creating a cause of action for harassment claims "regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims"); *Maiurano v. Cantor Fitzgerald Secs.*, No. 19-cv-10042, 2021 WL 76410, at *3 n.2 (S.D.N.Y. Jan. 8, 2021). "[I]t is as of yet unclear whether [the NYSHRL and NYCHRL] standards are co-extensive, or whether the NYSHRL requires something in between federal and local law," but district courts have generally agreed that "the amended NYSHRL standard is, at the very least, closer to the NYCHRL standard." *Nanakumo v. N.Y.C. Health & Hosps. Corp.*, No. 23-cv-314, 2025 WL 919479, at *10 (S.D.N.Y. Mar. 26, 2025).

i.    "Severe or Pervasive" Harassment

As I noted in the pre-motion conference I held on February 9, 2024, there are numerous genuine disputes of material fact concerning Smith's hostile work environment claims—under both the higher federal standard and the lower New York State and New York City standards.[17]

---

[17] In its opening brief, National Grid asks the Court to "dismiss the First Amended Complaint in its entirety" (National Grid Mem. at 12); however, nowhere in National Grid's pre-motion letter, supplemental letter, opening brief, or reply does it raise arguments as to Smith's hostile work environment claims under NYSHRL and NYCHRL. Nevertheless, since both the NYSHRL and the NYCHRL have a lower threshold for hostile work environment claims than Title VII and Section 1981, I find that there are genuine disputes of fact as to the state and local law claims as well. *See* N.Y. Exec. Law § 296(1)(h) (creating a cause of action for harassment claims "regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims"); *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 194 A.D.3d

For example, Smith claims, and Martin disputes, that Martin treated him in a harassing manner, including by overloading him with work, badgering him with emails, and acting in a manner Smith found to be physically threatening. (Smith Tr. II 100:23–101:14, 116:20–118:3, 127:22–130:2.) Smith also argues that his co-worker's act of writing "SHINE BOX" on his lock box contributed to a hostile work environment (although National Grid disputes whether the graffiti had a racially hostile meaning) and that the co-worker (Polumbo) was inadequately disciplined. (D00022 at D00029.)[18] These are disputed material facts that a jury must resolve.

    ii.    <u>Causation</u>

There is likewise a triable issue of fact over whether Smith experienced the alleged hostile work environment *because of* his race. For instance, Smith claims (and Martin disputes) that, when Smith asked him why he was receiving such harsh treatment, Martin responded in a manner that indicated it was because Smith is Black. (*Cf.* Smith Tr. II 52:7–21; Martin Tr. II 49:2–4, 51:18–25.) The record also includes examples of other Black coworkers experiencing instances of harassment: (1) Desrosiers, another Black employee, filed an internal complaint indicating that he felt threatened by Martin (D00022 at D00029); and (2) a white employee called a Black employee a "monkey," and Smith believes that the employee was inadequately disciplined (Smith Tr. 269:15–271:18).

---

999, 1003 (2d Dep't 2021) ("Under the NYCHRL, a plaintiff claiming a hostile work environment need only demonstrate that he or she was treated less well than other employees because of the relevant characteristic.").

[18] National Grid also asks me to decline to exercise supplemental jurisdiction over Smith's state law claims in the event I grant summary judgment as to the federal claims. (National Grid Mem. at 11). Since a number of Smith's federal claims remain, this argument is moot.

iii.    Employer Liability for Non-Supervisory Conduct

When a plaintiff sues an employer for hostile work environment based in part on the conduct of a co-worker, the plaintiff "must show a specific basis for imputing the objectionable conduct to the employer." *Cain v. McDonough*, No. 23-7302-CV, 2024 WL 5165548, at *1 (2d Cir. Dec. 19, 2024) (summary order) (citing *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015)). "An employer's liability for hostile work environment claims depends on whether the underlying harassment is perpetrated by the plaintiff's supervisor or the plaintiff's non-supervisory co-workers." *Id.* (citing *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015)). "When the harassment is attributable to a co-worker, the employer will be held liable only for its own negligence." *Id.* (citing *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998)). In such cases, the plaintiff must show either (1) that the "employer failed to provide a reasonable avenue for complaint" or (2) that the employer "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 762. In order to establish employer liability on a "fail[ure] to take appropriate remedial action" theory, the plaintiff must show (1) that "*someone* had actual or constructive knowledge of the harassment," (2) that "the knowledge of this individual can be imputed to the employer," and (3) that "the employer's response, in light of that knowledge, was unreasonable." *Id.* at 763.

There are triable material questions of fact concerning whether National Grid can be liable for the alleged harassing behavior of Smith's non-supervisory coworkers. In particular, there are questions of fact as to whether National Grid was negligent in concluding that Polumbo's act of writing "SHINE BOX" on Smith's lock box was not racially motivated (Demchak Tr. I 40:19–42:19; Demchak Tr. II 69:19–71:5) and whether National Grid failed to adequately discipline Polumbo as well as the individual who called Smith's Black coworker a "monkey" (Demchak Tr. I 63:5–64:4).

25

## II. Discrimination Claims

National Grid raises three principal arguments in support of its Motion for Summary Judgment on Smith's discrimination claims under Section 1981, Title VII, the NYSHRL, and the NYCHRL. First, National Grid argues that Smith's Section 1981 claim is time-barred with respect to alleged incidents occurring before December 15, 2017 and that his Title VII claim is time-barred with respect to alleged incidents occurring before June 27, 2020. (National Grid Mem. at 8–9.) Second, National Grid argues that Smith cannot succeed on his Section 1981, Title VII, NYSHRL, or NYCHRL discrimination claims because there is insufficient evidence from which a reasonable jury could conclude that Smith experienced an adverse employment action under the statutes' respective standards. (*Id.* at 5–8.) Third, as to his Section 1981 discrimination claim specifically, National Grid argues that no reasonable jury could find that racial discrimination was the "but-for" cause of the alleged disparate treatment. (*Id.* at 8.)

In opposition, Smith does not dispute National Grid's calculations of the limitations periods under Section 1981 and Title VII but argues that the "continuing violation" doctrine applies and, thus, none of his discrimination claims are time barred under these statutes. (Smith Opp'n at 7–8.) Further, Smith identifies three categories of conduct that he believes constitute adverse employment actions: "(1) denial of promotion for two supervisory positions; (2) reprimands and false accusations of performance issues; and (3) [the assignment of] a disproportionately high workload." (*Id.* at 9.) Finally, Smith argues that the record supports a causal connection between the alleged racial discrimination and adverse employment actions, citing comments made by Martin and Desrosiers' internal complaint to the Labor Relations team alleging racial discrimination. (*Id.* at 11–12.)

On reply, National Grid claims that "there is no credible evidence to support" any of the alleged adverse employment actions raised in Smith's opposition brief. (Reply at 2–8.)

26

Specifically addressing Smith's claim that he was denied two promotions, National Grid argues that the record does not support a discriminatory failure to promote claim because there is no evidence that Smith was qualified for the supervisory positions for which he applied or that, after rejecting Smith, National Grid continued to seek similarly qualified applications. (*Id.* at 2–3.) National Grid also argues that the "continuing violation" doctrine does not apply because the instances of discrimination Smith alleges were "discrete acts," rather than continuous acts taken pursuant to an "ongoing policy" of discrimination. (*Id.* at 9.)

As explained further below, I find the following:

(1) The "continuing violation" doctrine does not apply to Smith's Section 1981 and Title VII claims. Accordingly, Smith's Section 1981 discrimination claim is time-barred with respect to incidents occurring before December 15, 2017 and his Title VII discrimination claim is time-barred with respect to incidents occurring before June 27, 2020.

(2) There are triable issues of fact concerning whether Smith experienced an adverse employment action under Section 1981, Title VII, the NYSHRL, and the NYCHRL.

(3) No reasonable jury could find that Martin treated Smith worse than Shapiro (Smith's white predecessor) because there is no genuine dispute that Martin never supervised (or even worked with) Shapiro.

(4) No reasonable jury could find that National Grid discriminated against Smith based on a "failure to promote" theory, since the record does not contain any evidence showing that Smith was qualified for the two supervisory positions for which he applied.

(5) There is a genuine dispute of material fact concerning whether discrimination was the "but-for" cause of Smith's alleged discrimination under Section 1981.

### A.  Statute of Limitations and the "Continuing Violation" Doctrine

Section 1981's four-year statute of limitations and Title VII's 300-day time restriction—discussed above in connection with Smith's hostile work environment claims, *see* Discussion Section I.A—also apply to Smith's discrimination claims under those statutes. *Bamba v. Fenton*, 758 F. App'x 8, 10 (2d Cir. 2018) (summary order) (citing *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006)). Thus, National Grid argues that Smith's Section 1981 discrimination

claim is time-barred to the extent it is founded on discriminatory acts occurring before December 15, 2017 and that his Title VII retaliation claim is time-barred to the extent it is founded on discriminatory acts occurring before June 27, 2020.

Notwithstanding these limitations periods, "a continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the defendant to continue unremedied for so long as to amount to a discriminatory policy or practice." *Massaro v. New York City Dep't of Educ.*, No. 21-266-CV, 2022 WL 1788203, at *2 (2d Cir. June 2, 2022) (summary order) (citing *Cornwell v. Robinson*, 23 F.3d 694,704 (2d Cir. 1994)); *see also Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022) ("The doctrine applies to claims composed of a series of separate acts that collectively constitute one unlawful practice . . ."); *King v. Aramark Servs. Inc.*, 96 F.4th 546, 559 (2d Cir. 2024). Courts have emphasized that the "continuing violation" doctrine does not apply to "discrete unlawful acts, even where those discrete acts are part of a serial violation," but rather to "claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Massaro*, 2022 WL 1788203, at *2 (citing *Morgan*, 536 U.S. at 114–15). If the court finds that the "continuing violation" doctrine applies, it "must then consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Banks*, 81 F.4th at 259.

With respect to discrimination claims under Section 1981 and Title VII, "discrete acts" not covered by the "continuing violation" doctrine—"such as termination, failure to promote, denial of transfer, or refusal to hire"—are "easy to identify." *Morgan*, 536 U.S. at 114; *see also Tassy v. Buttigieg*, 540 F. Supp. 3d 228, 235 (E.D.N.Y. 2021) ("A failure to train is a discrete act."), *aff'd*, 51 F.4th 521. "Each incident of discrimination . . . constitutes a separate actionable

unlawful employment practice" under Title VII and Section 1981. *Morgan*, 536 U.S. at 114.

"Discrete acts of this sort, which fall outside the limitations period, cannot be brought within it,

even when undertaken pursuant to a general policy that results in other discrete acts occurring

within the limitations period." *Chin*, 685 F.3d at 157.

By contrast, district courts have found that a continuing violation exists where the

relevant acts are part of a continuous policy or practice. As Smith notes in his opposition brief, in

*Deering v. City of New York*, a court in this District held that the continuing violation doctrine

applied at the motion to dismiss stage to the plaintiff police officer's allegations that his

supervisor officers "communicated with one another to promote their intent to punish him" by,

among other things, frequently transferring him to undesirable posts and making sex-based

insults, notwithstanding that some of the alleged transfers and insults occurred outside of the

statutory window. No. 21-cv-3601, 2023 WL 3997261, at *3 (E.D.N.Y. June 14, 2023); Smith

Opp'n at 7. Smith also cites *Thorpe v. Piedmont Airlines, Inc.*, where a court denied the

defendant's motion to dismiss the plaintiff's age discrimination claims on statute of limitations

grounds because the complaint had plausibly alleged "continuous" violations in the form of

"repetitive incidents such as denied training opportunities, revocation of access to pertinent

information, and exclusion from the work schedule." 926 F. Supp. 2d 453, 464 (N.D.N.Y. 2013);

Smith Opp'n at 7–8.

In this case, the "continuing violation" doctrine does not apply to Smith's claims for

discrimination under Section 1981 and Title VII. The record evidence of disparate treatment

concerns "discrete unlawful acts" rather than "claims that by their nature accrue only after the

plaintiff has been subjected to some threshold amount of mistreatment"—including the following

evidence: (1) that Smith was denied a training opportunity in March 2018 (D00022 at D00029);

(2) that Martin falsely accused Smith of stealing a chair in February 2020 (Smith Tr. II 320:3–11); (3) that Martin falsely accused Smith of falsifying business records in May 2020 (P00010 at P00010–11); and (4) that Smith was denied promotions to supervisory roles in Fall 2021 and January 2022 (Smith Tr. II 321:23–25; Smith Aff. ¶¶ 22–25). *See Massaro*, 2022 WL 1788203, at *2; *Morgan*, 536 U.S. at 114 (discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire"); *Tassy*, 540 F. Supp. 3d at 235 ("A failure to train is a discrete act.").

The district court decisions on which Smith relies, *Deering* and *Thorpe*, are inapposite and, in any event, non-binding.[19] (*See* Smith Opp'n at 7–8.) As noted above, in *Deering*, the court found that the plaintiff had plausibly alleged a continuing violation based on allegations of "communic[ation]" between supervisors to engage in "over a dozen instances of repetitive discriminatory conduct." 2023 WL 3997261, at *3. Similarly, in *Thorpe*, the court found that the plaintiff alleged "continuous" conduct—not, as here, individual instances broken up over a period of years. 926 F. Supp. 2d at 464. For example, Smith presents evidence that Martin gave him an unreasonable workload in 2014, and that he first complained in the summer of that year.[20] (Smith Tr. II 50:2–52:21.) He then transferred to the Canarsie location in 2017, at which point Martin no longer supervised him. (Smith Tr. II 15:3–18.) Smith testified that in 2020 he was

---

[19] As National Grid correctly notes, both *Deering* and *Thorpe* addressed the "continuing violation" doctrine at the motion to dismiss stage based on allegations, not based on a developed factual record, as is the case here. (National Grid Reply at 9.)

[20] On reply, National Grid argues that I should disregard Smith's argument in his opposition brief and attestations in his supplemental affidavit that he received a "disproportionately high workload" on the grounds that Smith did not address this issue in his deposition. (National Grid Reply at 6.) This argument is without merit, as Smith testified: "[Martin would] send e-mails back to back, it's like a barrage. It's overloaded somewhat, especially when you're in the same building together. You send e-mails back to back, every other minute; I need an answer for this, I need an answer for this, I need an answer for that, why didn't you answer this, why didn't you answer that." (Smith Tr. II 100:23–101:14.)

again the recipient of excessive work expectations, but at that time, Vetrano—not Martin—was Smith's supervisor. (Smith Tr. II 126:2–8.)

For these reasons, the "continuing violation" doctrine does not apply to Smith's federal discrimination claims. Accordingly, Smith's Section 1981 discrimination claim is time-barred to the extent it is based on acts occurring before December 15, 2017, and his Title VII discrimination claim is time-barred to the extent it is based on acts occurring before June 27, 2020.[21]

## B.  Issues of Fact

At summary judgment, the Court analyzes Smith's Title VII and Section 1981 discrimination claims under the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973). *See Carr v. New York City Transit Auth.*, 76 F.4th 172, 177 (2d Cir. 2023).[22] Under this framework, "once a plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's action against the employee. If the employer does so, then the burden shifts back to the employee to show that the employer's articulated reason is pretext for discrimination." *Carr*, 76 F.4th at 177.

---

[21] "[E]ven with respect to a claim of discrete discriminatory or retaliatory acts, expiration of the limitations period does not bar an employee from using the prior acts as background evidence in support of a timely claim." *Davis-Garett*, 921 F.3d at 42 (citing *Morgan*, 536 at 113); *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176–77 (2d Cir. 2005) ("Relevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act.").

[22] In their briefing, neither party analyzes Smith's claims through the *McDonnell Douglas* framework, instead making arguments about discrete issues such as "adverse employment action" and "causation." Despite the parties' failure, I follow the Supreme Court and Second Circuit's binding precedent and apply the *McDonnell Douglas* analysis to the record before me.

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII discrimination claim, the plaintiff must show that (1) "[he] is a member of a protected class," (2) "[he] is qualified for [his] position," (3) "[he] suffered an adverse employment action," and (4) "the circumstances give rise to an inference of discrimination." *Banks*, 81 F.4th at 270.

Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). An employee's rights vis-à-vis his employer are included within the right "to make and enforce contracts." *See Williams v. N.Y.C. Housing Auth.*, 61 F.4th 55, 70 (2d Cir. 2023) ("[Section 1981] thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment . . ."). To prove a claim of discrimination under Section 1981, the plaintiff must show: "(1) [that he is] a member[] of a racial minority; (2) an intent to discriminate on the basis of [his] race by the defendant; and (3) [that] the discrimination concerned one of more of the activities enumerated in the statute." *Silva v. Farrish*, 47 F.4th 78, 89–90 (2d Cir. 2022). Implicit in this legal standard is the requirement that racial discrimination be the cause of the alleged interference with the employment right; in other words, the plaintiff must "prove that, but for race, [he] would not have suffered the loss of [the] legally protected right [at issue]." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020).

To succeed on an NYCHRL discrimination claim, a "plaintiff need only show differential treatment—that [the plaintiff] is treated less well—because of discriminatory intent." *Anderson*, 2024 WL 2801986, at *11 (citing *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)). The New York state legislature amended the NYSHRL in 2019; while New York courts have not yet determined the full effect of the amendments, district courts in this Circuit have interpreted them "to render the standard for claims closer to the standard of the NYCHRL." *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 452 n.4 (S.D.N.Y. 2024); *see also Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021).

i.    Adverse Employment Action

Concerning the Title VII "adverse employment action" requirement, under the Supreme Court's recent decision in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024), a plaintiff bringing a Title VII discrimination claim "does not have to show . . . that the harm incurred was significant[,] serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 357. Rather, the plaintiff only needs to show "some harm respecting an identifiable term or condition of employment"— i.e., the plaintiff must have been "left [] worse off" but not necessarily "significantly so." *Id.* at 355, 359. The Second Circuit has not yet determined whether this newly articulated standard applies to Section 1981 discrimination claims. However, I agree with other district courts in this Circuit that have held that the *Muldrow* standard does apply to Section 1981 discrimination claims because, like the text of Title VII, the text of Section 1981 does not contain a "significance" requirement. *See*, *e.g.*, *Anderson.*, 2024 WL 2801986, at *10–11.[23]

---

[23] *Compare* 42 U.S.C. 1981(a) ("All persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . .") *with* 42 U.S.C.

Under the NYCHRL, "the plaintiff need only show differential treatment—that [he] is treated less well—because of discriminatory intent." *Szewczyk v. Saakian*, 774 F. App'x 37, 38 (2d Cir. 2019) (summary order) (citing *Mihalik*, 715 F.3d at 110). Neither the Second Circuit nor the New York Court of Appeals has ruled on the precise scope of the newly amended NYSHRL, but courts in this Circuit have generally held that the amendments bring the standard closer to the NYCHRL. *Edelman v. NYU Langone Health Sys.*, No. 21-cv-502, 2022 WL 4537972, at * 14 (S.D.N.Y. Sept. 28, 2022); *see also Livingston*, 563 F. Supp. 3d at 232 n.14.

Under all of the above standards, there are genuine disputes of fact as to whether Smith experienced at least one qualifying adverse employment action under Title VII, Section 1981, the NYSHRL, and the NYCHRL. For example, Smith testified that his supervisors—first Martin and then Vetrano—treated him worse than other employees, including by overloading him with work and harassing him with frequent emails. (Smith Tr. II 100:23–101:14, 128:14–130:2.) The parties also dispute whether Martin singled out Smith on the basis of his race and ethnicity by making false accusations against him of stealing and falsifying business records. (P00010 at P00010–11.) Further, Smith testified that, although National Grid did not fire him, he "involuntarily" resigned at the advice of a mental health professional because of the alleged hostile work environment and on the understanding that the company would not promote him, despite his qualifications.[24]

2000e-2(a) ("It shall be an unlawful employment practice for a labor organization . . . to . . . discriminate against[] any individual because of his race . . .").

[24] Additionally, according to Smith, in an effort to find a better working situation within National Grid, he applied for two promotions, neither of which he received. (Smith Aff. ¶¶ 21–24; Smith Tr. 321:20–22.) With respect to the first promotion, he was not called in to interview. (Smith Aff. ¶ 22.) With respect to the second promotion, Smith testified in his deposition that he does not "[o]fficially" know why he did not get the promotion but attested under penalty of perjury in his supplemental affidavit that his co-worker Keinath stated the reason was that Smith was "not to be touched." (Smith Tr. II 321:23–25; Smith Aff. ¶¶ 22–24.) Smith further testified that he generally understood that "National Grid would not promote [him] into a supervisor position,

Smith Tr. II 327:4–24; *see Green v. Town of East Haven*, 952 F.3d 394, 404 (2d Cir. 2020) ("A plaintiff may prove a constructive discharge by establishing that his employer, rather than acting directly, deliberately made his working conditions so intolerable that he was forced into an involuntary resignation.").

Thus, with respect to Smith's discrimination claims under Title VII, Section 1981, the NYSHRL, and the NYCHRL, there exist, at a minimum, genuine disputes of fact as to whether Smith suffered an adverse employment action in the form of intolerable work conditions, failure to receive training opportunities, and involuntary resignation.

ii.    Disparate Treatment of Smith vs. Shapiro

National Grid correctly points out that Shapiro, who was Smith's white predecessor in the Parts Person role, left National Grid in January 2014 and that Martin started at National Grid in April 2014. (Martin Tr. I 13:12–15 (Martin testifying that his first day was April 28, 2014); ECF No. 52-2 (company records showing Shapiro's last day as January 29, 2014).) There is thus no triable issue of fact as to whether Martin treated Smith worse than he treated Shapiro, since Martin never supervised (or even worked with) Shapiro. Accordingly, I grant summary judgment to National Grid on Smith's discrimination claims under Section 1981, Title VII, the NYSHRL, and the NYCHRL, to the extent that those claims are founded on a theory that Martin treated him differently than he treated Shapiro. (*See* Smith Opp'n at 2 (incorrectly claiming that "Martin treated [Smith] differently than Shapiro").)

---

despite [his] nearly a decade long tenure with the company." (Smith Tr. II 321:23–25; Smith Aff. ¶ 25.) While these failures to promote Smith easily meet the adverse employment action standard under all of the relevant statutes, as explained below, the record does not raise a triable issue of fact concerning the other elements of a discriminatory failure to promote claim. *See* Discussion Section II.B.iii.

iii.    Failure to Promote

To prevail on a claim for discrimination specifically on a "failure to promote" theory, the plaintiff must show the following: "(1) he is a member of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Hernandez v. Office of Commissioner of Baseball*, No. 22-343-CV, 2023 WL 5217876, at *4 (2d Cir. Aug. 15, 2023) (summary order) (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004)).

Smith has identified no record evidence from which a reasonable jury could conclude (1) that he was qualified for the two supervisor positions for which he unsuccessfully applied or (2) that, after rejecting Smith, National Grid continued seeking candidates with his qualifications. *See* Smith Opp'n at 8–12; Smith Tr. II 327:4–328:7; Smith Aff. ¶¶ 21–25; *see also Hernandez*, 2023 WL 5217876, at *4. The only evidence in the record that sheds light on whether Smith was qualified for either role is that after Smith's departure from National Grid, Smith was hired as a "supervisor" at Con Edison, which involves supervising five auto mechanics. (Smith Tr. II 10:20–11:6.) Viewed in the light most favorable to Smith with all inferences drawn in his favor, the record does not identify any of the qualifications for either of the two supervisor positions for which Smith applied, much less raise a triable question of fact as to whether Smith was qualified for either role. Therefore, I grant summary judgment to National Grid on Smith's discrimination claims, to the extent that those claims are founded on a "failure to promote" theory.

iv.    Causation

National Grid also argues that the record does not raise a question of fact as to whether Smith's race was the "but-for" cause of the alleged adverse actions Smith experienced, as required to establish a discrimination claim under Section 1981. (National Grid Mem. at 8.) This

argument is without merit. The record contains evidence that supports the inference that Smith's alleged treatment was because of his race, for example: (1) when Smith confronted Martin about his harsh treatment and the fact that his work hours had been changed, Martin said, "People like us don't get to make these decisions," and gestured at his skin (Smith Tr. II 52:7–21); (2) Desrosiers (another Black employee) reported mistreatment by Martin and suspected that it was because of his race (D00022 at D00029); and (3) in 2020, National Grid denied Coleman (another Black employee) the opportunity to obtain a commercial driver's license, despite that a similarly situated white coworker was given the opportunity (Smith Tr. II 278:11–284:8). *See Shimanova v. TheraCare of N.Y., Inc.*, No. 15-cv-6250, 2017 WL 980342, at *4 (S.D.N.Y. Mar. 10, 2017) ("Evidence of discrimination against other employees may be relevant to proving discrimination." (citing *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008))).

### III. Retaliation Claims

National Grid raises four arguments in support of summary judgment on Smith's retaliation claims. First, National Grid argues that Smith's Title VII retaliation claim should be dismissed because Smith failed to check the "retaliation" box on his EEOC Charge and thus did not exhaust his administrative remedies. (National Grid Mem. at 10.) Second, as with Smith's discrimination claims, National Grid argues that the applicable Section 1981 and Title VII limitations periods bar Smith's retaliation claims under those statutes with respect to incidents occurring before December 15, 2017 and June 27, 2020, respectively. (*Id.* at 8–9.) Third, National Grid again contends that there is insufficient record evidence of an adverse employment action to sustain a retaliation claim under Title VII, Section 1981, the NYSHRL, or the NYCHRL. (*Id.* at 5–7.) Fourth, National Grid claims in a footnote that it is not disputing

causation for the purposes of this Motion, but then goes on to argue that Smith cannot show that Smith's race was a but-for cause of the alleged retaliation.[25] (*Id.* at 6 n.7, 7–8.)

In opposition, Smith concedes that he did not check the "retaliation" box on the EEOC Charge form but argues that this is not fatal, citing case law in which courts have looked to the substance of the allegations in an EEOC charge rather than the form's administrative requirements. (Smith Opp'n at 5–6 (citing *Littlejohn*, 795 F.3d at 322).) Concerning the limitations period, Smith again argues that the "continuing violation" doctrine applies. (*Id.* at 7–8.) Concerning the existence of an adverse employment action, Smith identifies three potential actions: (1) "denial of promotion for two supervisory positions," (2) "reprimands and false accusations of performance issues," and (3) Martin and Vetrano's imposition of "a disproportionately high workload." (*Id.* at 13.)  Finally, concerning causation, Smith contends that there are triable issues of fact as to whether emails from the Labor Relations department show that they harbored an animosity towards Smith for speaking out. (*Id.* at 13–14.)

On reply, National Grid reiterates its prior arguments, specifically highlighting its views (1) that Smith cannot show that he was qualified for the supervisory positions for which he interviewed and (2) that there is no evidence that National Grid had a retaliatory motive. (National Grid Reply at 2–3.)

As set forth below, I find the following:

(1) Smith exhausted his administrative remedies with respect to his Title VII retaliation claim.

---

[25] National Grid also appears to argue that there is no evidence that the alleged retaliation was because of Smith's *race*. This argument misinterprets the relevant standard for retaliation claims, which require that the retaliation be in response to the plaintiff's participation in a *protected activity* (e.g., reporting suspicions of racial discrimination), not because of the plaintiff's *race*. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (stating legal standard for retaliation claims under Title VII and the NYSHRL).

(2) The "continuing violation" doctrine does not apply to the retaliation claims and, accordingly, Smith's Section 1981 and Title VII retaliation claims are time-barred with respect to incidents occurring before December 15, 2017 and June 27, 2020, respectively.

(3) Under the respective standards of Title VII, Section 1981, the NYSHRL, and the NYCHRL, the record contains sufficient evidence to establish triable issues of fact as to whether Smith experienced any adverse employment actions.

(4) Nevertheless, there are only triable issues of fact as to whether Smith's filing of the EEOC Charge caused National Grid to retaliate by passing over Smith for two promotions; with respect to all other alleged protected activities and retaliatory actions, no reasonable jury could find that a retaliatory motive was the cause of the adverse action.

### A. Exhaustion of Administrative Remedies

Generally, a plaintiff may not bring a Title VII claim in federal court without first exhausting administrative remedies by filing an EEOC charge. *Duplan v. City of New York*, 888 F.3d 612, 621–22 (2d Cir. 2018). The Second Circuit has held, however, that "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency." *Buon v. Spindler*, 65 F.4th 64, 77 (2d Cir. 2023). "A claim is considered reasonably related" to claims in an EEOC charge "if the alleged conduct would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 110 n.5 (2d Cir. 2018), *aff'd sub nom, Bostock*, 590 U.S. at 644. Likewise, "it is well-settled that merely checking a box, or failing to check a box, does not necessarily control the scope of the EEOC [c]harge*." Rusis v. Int'l Bus. Machines Corp.*, 529 F. Supp. 3d 178, 233 (S.D.N.Y. 2021). The Second Circuit has established that where a "plaintiff has already filed an EEOC charge," courts "assume[] that the exhaustion requirement is also met for *a subsequent claim alleging retaliation* by an employer against [that] employee *for filing an EEOC charge*." *Duplan*, 888 F.3d, at 622 (emphasis added).

Here, while Smith did not check the "retaliation" box on the EEOC Charge form, his statement of facts expressly alleges "retaliation for opposing illegal harassment and discrimination." EEOC Charge ¶ 6; *see also Mohamed v. NYU*, No. 14-cv-8373, 2015 WL 3387218, at *13 (S.D.N.Y. May 21, 2015) (holding that failure to select box for "Retaliation" on EEOC form was "not dispositive of whether [plaintiff's] current claim of retaliation can be viewed as reasonably related to his other allegations"). Moreover, Smith's Title VII claim in part alleges retaliation *in response to* this EEOC Charge, and Smith cannot be expected to "re-exhaust new violations that are 'reasonably related' to the initial claim." *Duplan*, 888 F.3d at 622. Accordingly, Smith has exhausted his administrative remedies with respect to his Title VII retaliation claim.

### B.  Statute of Limitations and the "Continuing Violation" Doctrine

Section 1981's four-year statute of limitations and Title VII's 300-day time restriction likewise apply to Smith's retaliation claims under those statutes, as does the "continuing violation" analysis explained above. *Banks*, 81 F.4th at 260; *see also* Discussion Section I.A; Discussion Section II.A. Thus, absent a finding that the "continuing violation" doctrine applies, Smith's Section 1981 retaliation claims are time-barred to the extent they are founded on retaliatory acts occurring before December 15, 2017, and his Title VII retaliation claims are time-barred to the extent they are founded on retaliatory acts occurring before June 27, 2020.

The "continuing violation" doctrine does not apply to Smith's federal retaliation claims. *See* Discussion Section I.A. The retaliatory actions Smith identifies—"denial of promotion for two supervisory positions," "reprimands and false accusations of performance issues," and Martin and Vetrano's imposition of "a disproportionately high workload"—are "discrete acts" rather than "claims that by their nature accrue only after the plaintiff has been subjected to some

threshold amount of mistreatment." *Massaro*, 2022 WL 1788203, at *2; *see also Morgan*, 536 U.S. at 114; *Tassy*, 540 F. Supp. 3d at 235.

These discrete acts of alleged retaliation occurred on the following dates: (1) Martin assigned Smith a disproportionately high workload beginning in 2014 and Vetrano also assigned him a disproportionately high workload at some unknown time after Vetrano became Smith's supervisor, which occurred at some point after Smith returned to the Greenpoint location in 2018 "due to [Smith's] complaints with Kerry Martin"  (Smith Tr. II 126:2–130:2); (2) in February 2020, Martin falsely accused Smith of stealing a chair from his office (*id.* 320:3–11, 129:24–130:2); (3) in May 2020, Martin singled Smith out with an accusation of falsifying business records (P00010 at P00010–11); (4) in Fall 2021, Smith applied for, but was denied, a promotion to a "supervisor development position" (Smith Tr. II 321:23–25; Smith Aff. ¶¶ 22–25); and (5) around January 2022, Smith applied and interviewed for, but was denied, a promotion to the role of "warehouse supervisor" (Smith Tr. II 321:23–25; Smith Aff. ¶¶ 22–25). Under Section 1981's December 15, 2017 cut-off date, all of these alleged instances of retaliation are timely, with the exception of any acts to assign Smith a disproportionately high workload that predate the cut-off date. Under Title VII's June 27, 2020 cut-off date, all incidents are timely with the exception of the chair incident, the falsifying business records incident, and any acts to assign Smith a disproportionately high workload that predate the cut-off date.

### C.  Issues of Fact

Summary judgment motions on Title VII and Section 1981 retaliation claims are also governed under the *McDonnell Douglas* framework. *Carr*, 76 F.4th at 178. Under Title VII's antiretaliation provision, it is unlawful for an employer to "discriminate against an employee because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3. To establish a

prima facie claim for retaliation, a plaintiff must "demonstrate that (1) [he] engaged in protected activity, (2) the defendant was aware of that activity, (3) [the plaintiff] was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr*, 76 F.4th at 180 (Title VII retaliation case citing 42 U.S.C. § 2000e-3(a)); *Banks*, 81 F. 4th at 275 (applying same standard for retaliation claims under Title VII and Section 1981). Upon the plaintiff meeting the minimal burden of showing a prima facie retaliation claim, the burden shifts to the defendant to show a "legitimate, non-retaliatory reason for the alleged retaliatory action." *Carr*, 76 F.4th at 178. If the defendant meets its burden, then "the presumption of retaliation dissipates, and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." *Id.*

The NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has . . . opposed any practice forbidden" under the NYCHRL. N.Y.C. Admin. Code § 8-107(7). Specifically, the plaintiff must show: (1) that he "engaged in a protected activity as that term is defined under the NYCHRL"; (2) that his "employer was aware that he or she participated in such activity"; (3) that his "employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity"; and (4) that "there is a causal connection between the protected activity and the alleged retaliatory conduct." *Milford-Francois v. N.Y. State Off. of Medicaid Inspector Gen.*, 635 F. Supp. 3d 308, 330 (S.D.N.Y. 2022).

Here, too, while courts have not yet clearly defined the scope of the newly amended NYSHRL, they have generally agreed that the new retaliation standard is "more liberal" than the

federal standard and closer to the NYCHRL. *See Menos v. Uncle Nearest, Inc.*, No. 22-cv-1449, 2025 WL 917347, at *16 (E.D.N.Y. Mar. 25, 2025).

Resolving disputes of fact concerning elements of the plaintiff's prima facie case, for example causation, is a "quintessential jury function." *Rasmy v. Marriot Int'l, Inc.*, 952 F.3d 379, 392 (2d Cir. 2020); *see also id.* at 392–93 (denying summary judgment on the plaintiff's retaliation claim where disputes of fact existed as to whether the defendant was aware of the alleged discriminatory conduct and "what motivated [the defendant's] desire" to engage in the alleged retaliation).

i.     Protected Activity

Smith identifies three potential protected activities that, he contends, form the basis of his retaliation claims: (1) Smith's March 2018 complaint to the Labor Relations team that he was not getting the same training opportunities as junior employees (D00022 at D00029; Demchak Tr. I 102:19–103:1); (2) Smith's February 2020 complaint to the Ethics team that he felt "extremely threatened by the things [Martin] says to him" after Martin accused him of stealing a chair from his office (D000386 at D000389); and (3) Smith's May 2020 complaint to the Labor Relations team that Martin accused him of falsifying business records despite the fact that he was engaging in the same practice as other, white employees (P00010 at P00010–11; P00007 at P00007–08). (*See* Smith Opp'n at 13.) National Grid does not dispute that Smith made these complaints. (*See* Rule 56.1 Resps. ¶¶ 43, 84, 74–79.) Accordingly, each of these complaints made within National Grid could constitute protected activity. *See Littlejohn*, 795 F.3d at 317 (holding that "informal protests of discriminatory employment practices, including making complaints to management," are protected activities); *Rivera v. JP Morgan Chase*, 815 F. App'x 603, 607–08 (2d Cir. 2020) (analyzing complaint to human resources department as a protected activity under Title VII) (summary order citing *Littlejohn*, 975 F.3d at 315–16). Smith's April 23, 2021 filing of the

EEOC Charge is also not disputed and constitutes a protected activity that could form the basis of a retaliation claim. *See Duplan*, 888 F.3d at 622 (addressing retaliation in response to EEOC charge).

ii.      National Grid's Awareness of Protected Activity

As noted above, in order to make a prima facie showing of a retaliation claim, the plaintiff must also establish that the employer was aware of the alleged protected activity. *See* Discussion Section III.C.i; *Carr*, 76 F.4th at 180. In its submissions, National Grid does not argue that it was *not* aware of the three alleged protected activities raised by Smith; nor does it argue that it was not aware that Smith had filed the EEOC Charge. (*See generally* National Grid Mem.; National Grid Reply.) Having reviewed the record independently, I find that there is, at least, a triable question of fact over whether National Grid was aware of these four events. *See* Demchak Tr. I 31:15–20 (Demchak testifying that she was aware that Smith "had filed multiple complaints about unfair treatment while working at National Grid"); Demchak Tr. II 27:25– 28:20 (Demchak referencing her involvement in investigating "a couple of complaints" made by Smith); 42 U.S.C. § 2000e–5(b) ("Whenever a charge is filed by . . . a person claiming to be aggrieved . . . alleging that an employer . . . has engaged in an unlawful employment practice, the [EEOC] shall serve a notice of the charge . . . within ten days . . .").

iii.      Adverse Employment Action

Under Title VII and Section 1981, an alleged retaliatory action is "materially adverse" if it is "significant"—i.e., if it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Muldrow*, 601 U.S. at 348 (citing *White*, 548 U.S. at 68, and addressing Title VII's anti-retaliation provision); *Littlejohn*, 795 F.3d at 316 (holding that the same standard applies to retaliation claims under Title VII and Section 1981). The NYCHRL requires a showing that the adverse action was "reasonably likely to deter a person from

engaging in such action." *Mihalik*, 715 F.3d at 112. As with discrimination claims, courts have generally agreed that the newly amended NYSHRL has brought the standard for retaliation claims "closer to the standard under the NYCHRL." *Dinis v. New York City Dep't of Educ.*, 22-cv-7741, 2024 WL 1421160, at *12 (S.D.N.Y. Feb. 8, 2024); *Wellner v. Montefiore Med. Ctr.*, No. 17-cv-3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).

Smith identifies three potential instances of retaliation: (1) that Smith was provided with a disproportionately high workload, about which he first complained in the summer of 2014 (Smith Tr. II 50:2–52:2); (2) that Smith experienced "reprimands and false accusations of performance issues," apparently referring to Martin's May 2020 allegation that Smith falsified business records (Smith Tr. II 50:2–52:2) and Martin's October 2020 accusation that Smith committed an OSHA violation (Martin Tr. I 107:8–109:8); and (3) that Smith was denied two promotions, one in Fall 2021 and one in January 2022 (Smith Aff. ¶¶ 21). (Smith Opp'n at 13.) As an initial matter, a reasonable jury viewing the evidence concerning these incidents could find that, at least in certain contexts, any of the aforementioned conduct would "dissuade a reasonable worker from making or supporting a charge of discrimination" (under Section 1981 and Title VII) or would be "reasonably likely to deter a person from engaging in such action" (under the NYCHRL and the NYSHRL). *See, e.g., Craven v. City of New York*, No. 19-cv-1486, 2020 WL 2765694, at *6 (S.D.N.Y. May 28, 2020) (finding at the motion to dismiss stage that the plaintiff had stated a claim for retaliation under Section 1981, Title VII, the NYSHRL, and the NYCHRL where the plaintiff alleged that she was assigned an excessive workload in retaliation for participating in an interview with her company's equal employment office); *O'Brien v. City of New York, Dep't of Educ.*, 686 F. Supp. 3d 221, 242 (E.D.N.Y. 2023) (finding "false accusations of lateness" may constitute an adverse retaliatory action under Title VII); *Dillon v. Morano*, 497

F.3d 247, 251 (2d Cir. 2007) (holding that a denied promotion is a qualifying adverse employment action in the context of First Amendment retaliation claim); *Duplan*, 888 F.3d at 622 (addressing retaliation in response to EEOC charge). Nevertheless, as discussed in the following section, not all of these alleged retaliatory actions meet the applicable standards for causation.

iv.     Causation

As previously explained, summary judgment motions under Title VII and Section 1981 are analyzed under the *McDonnell Douglas* burden-shifting framework. *Carr*, 76 F.4th at 178. The demonstration of a prima facie case itself requires showing a "causal connection" between the protected activity and the adverse action. *Id.* at 180. If the plaintiff has submitted evidence from which a reasonable jury could conclude that the plaintiff has made a prima facie showing of retaliation and the defendant has rebutted that showing by offering a legitimate, non-retaliatory reason for the action, the burden then shifts back to the plaintiff to show that retaliatory intent was the "but-for" cause of the challenged action. *Id.* at 178. At the first step, the plaintiff may rely on temporal proximity between the alleged protected activity and the alleged retaliation to make a prima facie showing of retaliation. *Zann Kwan v. Andalex Grp..LLC*, 737 F.3d 834, 845 (2d Cir. 2013). Once the defendant has raised a legitimate, non-retaliatory reason, however, the plaintiff now bears the burden of showing that the record presents a question of fact as to whether the retaliatory motive was a "but-for" cause of the alleged retaliation. *Id.* While temporal proximity may be relevant "circumstantial evidence" of but-for causation, it is not alone sufficient to establish such causation. *Walker v. Senecal*, 130 F.4th 291, 299 (2d Cir. 2025). A plaintiff may prove that retaliation was a but-for cause of an adverse employment action directly by proffering "direct evidence of retaliatory animus," *Gonzalez v. City of New York*, 845 F. App'x 11, 14–15 (2d Cir. 2021) (summary order) (citing *Hicks*, 593 F.3d at 170), or

indirectly by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action," *Zann Kwan*, 737 F.3d at 846.

By contrast, under the NYCHRL, the plaintiff only needs to establish that the alleged retaliatory action "was motivated at least in part by . . . retaliatory motives"; accordingly, "summary judgment is appropriate only if the plaintiff cannot show that retaliation played *any part* in the employer's decision." *Mihalik*, 715 F.3d at 113, 116 (emphasis added). As previously noted, the full scope of the newly amended NYSHRL has not been established, but courts generally agree that its standards are closer to the NYCHRL. *See Menos*, 2025 WL 917347, at *16.

Smith does not clearly identify the specific alleged protected activities that were targeted by each of the specific alleged retaliatory actions. As noted above, the record establishes that Smith engaged in four protected activities: (1) in March 2018, he complained to the Labor Relations team that he was not getting the same training opportunities as junior employees (D00022 at D00029; Demchak Tr. I 102:19–103:1); (2) in February 2020, he complained to the Ethics team that he felt "extremely threatened by the things [Martin] says to him" after Martin accused him of stealing a chair from his office (D000386 at D000389); (3) in May 2020, he complained to the Labor Relations team that Martin accused him of falsifying business records despite the fact that he was engaging in the same practice as other, white employees (P00010 at P00010–11; P00007 at P00007–08); and (4) in April 23, 2021, he filed the EEOC Charge. Separately, Smith identifies three potential instances of retaliation: (1) that Smith was provided with a disproportionately high workload sometime prior to when he first complained about this issue during the summer of 2014 (Smith Tr. II 50:2–52:2); (2) that Smith experienced

"reprimands and false accusations of performance issues," apparently referring to Martin's May

2020 allegation that Smith falsified business records (Smith Tr. II 50:2–52:2) and Martin's

October 2020 accusation that Smith committed an OSHA violation (Martin Tr. I 107:8–109:8);

and (3) that Smith was denied two promotions, one in Fall 2021 and one in January 2022 (Smith

Aff. ¶¶ 21). (Smith Opp'n at 13.) I address each alleged protected activity and retaliatory action

below.

First, Smith's claim of retaliation in response to his March 2018 complaint of being

denied training opportunities fails as a matter of law for two reasons: (1) Smith has not shown

sufficient temporal proximity between this event and any of the potentially retaliatory acts such

that he has identified a material question of fact about this element for establishing a prima facie

retaliation claim; and (2) even if Smith has done so, he has not pointed to any evidence—

temporal or otherwise—from which a jury could find a causal link between these events as

required to raise a material question of fact about causation.[26] *See McAllister v. Queens Borough*

*Pub. Library*, 309 F. App'x 457, 459 (2d Cir. Feb. 10, 2009) (requiring the plaintiff to

"demonstrate a causal connection between the alleged adverse action and the protected activity")

(summary order citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)). The

alleged excessive workload first began in 2014, *predating* Smith's March 2018 complaint of

being denied training opportunities. *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95

(2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job

---

[26] In failing to apply the *McDonnell Douglas* framework to the evidence in the record, Smith
does not address whether Martin was even aware of Smith's complaints to the Labor Relations
team. (*See generally* Smith Opp'n.) Nevertheless, in reviewing the full factual record submitted,
the Court found testimony from Demchak confirming that she discussed Smith's complaints with
Martin. (Demchak Tr. I 59:19–24, 128:14–18.) Accordingly, there is sufficient evidence from
which a reasonable jury could conclude that Martin was aware of Smith's complaints.

actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). There is too large a temporal gap between Smith's 2018 complaint and Martin's May 2020 and October 2020 accusations against Smith, as well as Smith's denied promotions in Fall 2021 and January 2022; thus, even viewing the facts in light most favorable to Smith, the record does not give rise to a question of fact as to whether there was a causal connection between the 2018 complaint and later allegedly retaliatory actions. *See Harrison v. U.S. Postal Serv.*, 450 F. App'x 38, 41 (2d Cir. 2011) (summary order) (finding that a "temporal gap of almost two years" is "too great to give rise to an inference of causation"); *Burkybile v. Bd. of Educ.*, 411 F.3d 306, 314 (2d Cir. 2005) (finding no causation where more than a year passed between the protected activity and the alleged retaliatory conduct).

Second, Smith has likewise failed to show that the record presents a material question of fact as to whether there is a causal connection between his February 2020 complaint to the Labor Relations team about Martin accusing him of stealing a chair and any of the three alleged retaliatory actions. Further, even if there is enough to establish the minimal causal connection required for a prima facie claim, Smith has failed to raise a material question of fact as to but-for causation. As previously noted, Smith testified that he began receiving an excessive workload in 2014, approximately six years *before* he made the alleged February 2020 complaint. Similarly, there is too large a temporal gap between Smith's February 2020 complaint and the denial of his applications for promotions in Fall 2021 and January 2022 for the timing alone to raise a material question of fact as to causation. *See Harrison*, 450 F. App'x at 41; *Burkybile*, 411 F.3d at 314; *Rasmy*, 952 F.3d at 392 ("[T]he question of what motivated an employer's desire" to engage in the alleged retaliatory conduct is "a quintessential jury function.").

Martin's May 2020[27] accusation that Smith falsified business records and his October 2020 accusation that Smith committed an OSHA violation are closer in time to Smith's February 2020 complaint. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship."). However, these alleged actions are part of an alleged pattern of "gradual adverse job actions" by Martin that began well before Smith's February 2020 complaint and thus do not give rise to an inference of retaliation. *See Slattery*, 248 F.3d at 95.

Third, and for substantially the same reasons, Smith's claim of retaliation in response to Martin's May 2020 accusation that he falsified business records also fails at the prima facie step in the *McDonnell Douglas* analysis: (1) the alleged excessive workload began in 2014, *predating* this protected activity; (2) Martin's alleged accusation that Smith falsified business records obviously occurred before Smith lodged a complaint about *that very same incident* in May 2020; (3) although Martin's October 2020 allegation that Smith violated OSHA rules is closer in time to the May 2020 complaint, it does not give rise to an inference of discrimination because it was

---

[27] Although the parties appear to agree that Martin's accusation that Smith falsified business records occurred in May 2020, at her deposition, Demchak read from an internal document describing Martin's complaint, which was dated January 27, 2020. (*See* Smith Rule 56.1 Resps. ¶ 74 (no dispute that this event happened "[i]n or around May 2020"; Demchak Tr. I 58:6–13 (Demchak reading from January 27, 2020 document).) Therefore, there is a question as to whether this alleged retaliatory action (Martin accusing Smith of falsifying business records) actually occurred *before* the alleged protected activity (Martin reporting that Smith falsely accused him of stealing a chair). To the extent that it did, it cannot be that the later protected activity in February 2020 caused the complaint that took place sometime before January 27, 2020.

part of Martin's long-term "gradual adverse job action," *Slattery*, 248 F.3d at 95; and (4) Smith's failed promotions in Fall 2021 and January 2022 are too far removed in time. To the extent that Smith has established the causal connection required for a prima facie retaliation claim as to the October 2020 alleged OSHA violation or the failed promotions, he has not raised a material question of fact that the May 2020 complaint was a but for cause of these actions.

Fourth, to the extent Smith claims retaliation based on his April 23, 2021 filing of the EEOC Charge, this claim fails at the first *McDonnell Douglas* step with respect to all alleged retaliatory actions that came before it (the excessive workload beginning in 2014 and Martin's accusations in 2020).

However, the record contains evidence establishing a prima facie claim that National Grid retaliated again Smith after he filed the EEOC Charge by failing to promote him in Fall 2021 and January 2022.[28] Both of these alleged retaliatory actions occurred less than a year after Smith filed the EEOC Charge, making these events relatively close in time. *See Gorzynski*, 596 F.3d at 110 (holding that there is no "bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation").

---

[28] On reply, National Grid asks me to strike statements made by Smith under penalty of perjury in his supplemental affidavit regarding his understanding that Keinath, a supervisor, said he was denied promotions because he was "not to be touched," on the basis that Smith's affidavit contradicts his deposition testimony. (National Grid Reply at 3–4.) At his deposition, Smith testified that, despite not being "100 percent sure," he "believe[d] it was Charlie Keinath" who made the statement. (*See* Reply at 3 – 4 (citing Smith Tr. 321–22 (not provided in the record)).) In his affidavit, he attests that it was, in fact, Keinath who made the statement. (Smith Aff. ¶ 24.) National Grid is correct that a party "cannot defeat a motion for summary judgment by responding with affidavits recanting earlier deposition testimony." (*Id.* at 3 (citing *Benefitvision Inc. v. Gentiva Health Servs.*, No. 09-cv-0473, 2011 WL 888280, at *8 (E.D.N.Y. Mar. 14, 2011)).) I do not, however, agree with National Grid that Smith's deposition testimony and his affidavit are contradictory on this point; Smith merely expressed more certainty in his affidavit statement than in his deposition testimony. Regardless, Smith's deposition testimony alone is sufficient to establish a triable issue of fact as to whether Keinath told him that he was "not to be touched."

Failing to analyze the facts according to the *McDonnell Douglas* framework in its briefing, National Grid does not expressly offer a legitimate, non-retaliatory justification for why Smith was denied promotions to the two supervisory positions for which he applied. I construe National Grid's argument on reply that "there is no evidence that Smith was qualified for any supervisory position" to mean that National Grid contends that it did not promote Smith because he was not qualified. (*See* National Grid Reply at 2–3.) Nevertheless, the record contains ample evidence from which a jury could reasonably conclude that National Grid's reason was pretextual. First, there is ample evidence in the record to support a jury determination that the National Grid Labor Relations team disliked Smith for complaining about racial discrimination. (*See* D000826 (Demchak writing in an email that "[t]here is not enough Dr[.] Pepper in the world" in response to complaint email from Smith); D000738 at D000738–39 (Demchak writing in an email that her "eyes [were] rolling" in response to a complaint email from Smith). Second, there is a disputed issue of fact as to whether a supervisor at National Grid said that Smith was denied a promotion because he was "not to be touched" following his complaints.[29] (Smith Tr. II 321:23–25; Smith Aff. ¶¶ 22–25.)

---

[29] In granting summary judgment on Smith's discrimination claims based on the theory that National Grid twice failed to promote him but denying summary judgment on his retaliation claims based on the same alleged failures to promote, I emphasize that different legal standards apply to "failure to promote" discrimination and retaliation claims. A "failure to promote" discrimination claim requires the plaintiff to show that: "(1) he is a member of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Hernandez*, 2023 WL 5217876, at *4. As explained above, there is no record evidence from which a reasonable jury could conclude that Smith was qualified for the two positions for which he was not promoted or that the positions remained open for similarly situated candidates following Smith's rejection. Discussion Section II.B.iii. By contrast, a "failure to promote" retaliation claim requires the plaintiff to show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the

Accordingly, I deny National Grid's Motion with respect to Smith's claim for retaliation based on his filing of the EOOC Charge and subsequent failure to be promoted to a supervisor development position in Fall 2021 and to the role of warehouse supervisor in January 2022. I grant National Grid's Motion with respect to all other aspects of Smith's retaliation claim.

## CONCLUSION

For the reasons explained above, National Grid's Motion for Summary Judgment (ECF No. 46) is granted in part and denied in part.


Dated:  Central Islip, New York
        April 30, 2025

                            _____/s/ Nusrat J. Choudhury_____
                            NUSRAT J. CHOUDHURY
                            United States District Judge

---

adverse employment action." *Littlejohn*, 794 F.3d at 316. Under this standard, a reasonable jury could infer that Smith's two failed promotions were retaliatory based on "circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct" or "direct . . . evidence of retaliatory animus directed against [Smith]," notwithstanding that the record contains few details about the two positions for which he applied. *Rowe v. New York State Dep't of Taxation and Finance*, 786 F. App'x 302, 305 (2d Cir. 2019) (summary order applying *Littlejohn* standard in "failure to promote" retaliation context).